## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## CLARKSBURG

**JAMES KENNETH TENNANT,**

        Plaintiff,

**v.**

                               **CIVIL ACTION NO.: 1:16-CV-51 (KEELEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

        Defendant.

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

On March 28, 2016, Plaintiff James Kenneth Tennant ("Plaintiff"), through counsel Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On May 23, 2016, the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On June 20, 2016, and August 19, 2016,[1] Plaintiff and the Commissioner filed their respective Motions for Summary Judgment and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14). On August 29, 2016, Plaintiff filed a Reply to the

---

[1] On July 15, 2016, the Commissioner requested an additional thirty days in which to file her Motion for Summary Judgment, which was granted. (Def.'s Mot. for Extension of Time, ECF No. 12; Order Granting Def.'s Mot. for Extension of Time, ECF No. 13). Therefore, the Commissioner's Motion was timely filed.

Commissioner's brief. (Resp., ECF No. 16). The matter is now before the undersigned

United States Magistrate Judge for a Report and Recommendation to the District Judge

pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth

below, the undersigned finds that substantial evidence supports the Commissioner's

decision and recommends that the Commissioner's decision be affirmed.

## II.    PROCEDURAL HISTORY

On October 20, 2011, Plaintiff protectively filed a Title II claim for disability

insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI")

benefits, alleging disability that began on February 17, 2011.[2] (R. 14). Plaintiff's Title

XVI claim "was non-medically denied because [Plaintiff] was found to have available

resources in excess of the maximum allowable level."[3] (Id.). Plaintiff's Title II claim was

initially denied on February 16, 2012, and denied again upon reconsideration on

November 29, 2012. (R. 90, 96). After these denials, Plaintiff filed a written request for a

hearing. (R. 99).

On May 21, 2014, a video hearing was held before United States Administrative

Law Judge ("ALJ") Carl Alexander in Morgantown, West Virginia. (R. 14, 31, 115). Linda

Dezack, an impartial vocational expert, appeared and testified in Morgantown. (R. 14,

31). Plaintiff, represented by Andrea Atkins, Esq., appeared and testified in Wheeling,

West Virginia. (Id.). On July 25, 2014, the ALJ issued an unfavorable decision to

---

[2] Plaintiff previously filed applications for DIB and SSI benefits on April 15, 2003, which were unsuccessful. (R. 14). Subsequently, Plaintiff reapplied for DIB and SSI benefits, alleging a "closed period of disability" spanning from November 18, 2004, to July 1, 2007, "as he had returned to work on or around the latter date." (Id.). The Commissioner found in favor of Plaintiff, "awarding benefits to [Plaintiff] for the closed period request, with a finding that his disability had ended on July 1, 2007." (Id.).

[3] Plaintiff is not contesting the denial of his Title XVI claim, only the denial of his Title II claim. (Pl.'s Mem. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 1-2, ECF No. 11).

Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 11). On January 29, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.     <u>BACKGROUND</u>

### A.     Personal History

Plaintiff was born on July 24, 1966, and was forty-five years old at the time he filed his claim for benefits. (<u>See</u> R. 68). He is 5'11" tall and weighs approximately 152 pounds. (R. 186). He lives alone in a "double-wide mobile home." (R. 37, 204). He completed high school and two years of college, resulting in him receiving an associate's degree in electrical engineering. (R. 38, 186). However, he has not received any specialized, trade or vocational training. (R. 187). His prior work experience includes working as a chart reviewer/billing clerk, an electrician and an electrical programmer/computer programmer. (R. 45). He alleges that he is unable to work due to the follow ailments: (1) depression; (2) high blood pressure; (3) a history of a heart attack; (4) back impairments; (5) neck impairments and (6) knee impairments. (R. 186).

### B.     Medical History

#### 1.    Medical History Pre-Dating Alleged Onset Date of February 17, 2011[4]

On February 3, 2010, Plaintiff presented to the emergency room at Ruby Memorial Hospital, seeking alcohol detoxification. (R. 861). Plaintiff was transferred to Chestnut Ridge Hospital and admitted to the dual diagnosis unit. (<u>Id.</u>). He was

---

[4] Plaintiff submitted medical records dated February 12, 2003, through June 5, 2006. (R. 235-549). While reviewed, these records will not be discussed at this time because they are more pertinent to Plaintiff's previous applications for DIB and SSI benefits. Moreover, because the Commissioner has already examined this time period during Plaintiff's previous claim for DIB and SSI benefits and determined that Plaintiff was disabled from November 18, 2004, until July 1, 2007, the content of these records is not at issue. (R. 49-58).

diagnosed with, *inter alia*, alcohol dependence with physiologic dependence. (R. 864).

After almost a week of hospitalization, Plaintiff was discharged on February 8, 2010. (R.

861).

### 2. Medical History Post-Dating Alleged Onset Date of February 17, 2011

On July 13, 2011, Plaintiff presented to Wheeling Health Right, where he

received primary care. (R. 606). During this visit, it was documented that Plaintiff was

not prescribed any routine medications but only Flexeril, a muscle relaxant, and

Restoril, which treats insomnia, on an as needed basis. (Id.). It was also documented

that Plaintiff was a smoker and was trying to "ween down" from one pack of cigarettes

per day. (Id.). Finally, it was documented that Plaintiff possessed a history of severe

alcoholism, although Plaintiff stated that he had been sober for three months. (Id.). After

an examination, during which Plaintiff complained of a "full, constant ache" in his

abdomen, Plaintiff was diagnosed with abdominal pain, although it was uncertain

whether the pain was caused by acid reflux or was cardiac-related. (R. 607). An

ultrasound of Plaintiff's gallbladder was ordered, the results of which were normal, and

Plaintiff was started on Protonix, which is used to treat acid reflux. (R. 607, 620).

On September 8, 2011, Plaintiff presented to the emergency room at Wetzel

County Hospital, complaining of upper gastric pain. (R. 550). After an examination,

Plaintiff was diagnosed with an acute, anterior myocardial infarction. (Id.). The following

day, Plaintiff was transported to the care of Robert J. Fanning, D.O., a cardiologist at

Wheeling Hospital. (R. 562, 568). Dr. Fanning performed an immediate percutaneous

transluminal coronary angioplasty on Plaintiff. (R. 567). During the procedure, Dr.

Fanning noted:

(1)     Successful bare-metal stenting of the ostial and proximal left anterior descending artery . . . .

(2)     Total occlusion of the right coronary artery . . . .

(3)     Severe LV systolic dysfunction.

(R. 578). After the angioplasty, Plaintiff was discharged with instructions to stop smoking and to start taking aspirin. (R. 572). He was also prescribed Plavix, Ramipril, Coreg, nitroglycerin and simvastatin. (Id.).

Subsequent to his hospitalization, Plaintiff returned to Wheeling Health Right for follow-up care. On September 13, 2011, Plaintiff received "a work slip" excusing him from work for the following two weeks. (R. 604). Plaintiff was also referred to Dr. Fanning for cardiac rehabilitation. (Id.). On September 28, 2011, Plaintiff stated that he was only smoking half a pack per day and was "feel[ing] OK" physically. (R. 614). However, Plaintiff further stated that he was mentally "feeling down" and requested an appointment with a counselor. (Id.). While an appointment with a counsel was scheduled, Plaintiff canceled the appointment. (R. 645).

On October 12, 2011, Plaintiff began his cardiac rehabilitation with Dr. Fanning.[5] (R. 597, 612). The following day, Dr. Fanning ordered an echocardiogram of Plaintiff, which revealed:

(1)     Normal left ventricular systolic function without regional wall motion abnormality.

(2)     Mild posterolaterally directed mitral regurgitation.

(R. 611).

_____

[5] It appears that Plaintiff participated in cardiac rehabilitation with Dr. Fanning through the end of the year. (See R. 612, 659, 663).

On November 9, 2011, Plaintiff presented to Wheeling Health Right for a follow-up appointment. (R. 609). During this appointment, Plaintiff stated that he was feeling "physically well." (Id.). However, Plaintiff further stated that he had stopped taking his depression medication due to the side effect of sexual dysfunction. (Id.). Therefore, Plaintiff's depression medication was changed to Lexapro. (Id.). Plaintiff was also scheduled to see a counselor that same day.[6] (R. 658).

On December 8, 2011, Plaintiff presented to the office of M.F. Anwar, M.D., an ophthalmologist, for an eye examination. (R. 637). During this visit, Plaintiff stated that he had been experiencing double vision for the past month. (R. 641). After the examination, Dr. Anwar documented that Plaintiff's "[v]isual acuity was 20/20 aided" and that there was "no ocular explanation for the [double vision]." (Id.). Therefore, Dr. Anwar recommended that Plaintiff "see a neuro ophthalmologist." (Id.). Subsequently, an MRI of Plaintiff's brain was ordered, which revealed:

> No acute intracranial process. Mild small vessel ischemic gliosis. There is a left basal ganglia scar.

(R. 661).

On December 28, 2011, Plaintiff presented to Wheeling Health Right, requesting an increase in his Lexapro prescription. (R. 657). After an examination, it was noted that Plaintiff exhibited good eye contact and proper affect. (Id.). It was also noted that Steven Lynn Corder, M.D., a psychiatrist, would be consulted regarding Plaintiff's depression medications. (Id.). Subsequently, after the consult, Plaintiff was prescribed Wellbutrin in addition to Lexapro. (R. 646).

---

[6] In addition to this appointment, Plaintiff participated in at least two other counseling sessions. (R. 647, 707).

On February 10, 2012, Plaintiff returned to Wheeling Health Right. (R. 705). During this visit, Plaintiff stated that he was still smoking and that he was only twelve days sober following a relapse that he had suffered "a few weeks ago." (Id.). After an examination, Plaintiff requested medication to help him sleep at night and was prescribed trazodone. (Id.).

On March 22, 2012, Plaintiff presented to the office of Brian D. Ellis, M.D., an ophthalmologist of the West Virginia University ("WVU") Eye Institute. (R. 673). Plaintiff informed Dr. Ellis that he had always suffered from intermittent double vision but that it had worsened in November of 2011. (Id.). After an examination, Dr. Ellis instructed Plaintiff to start taking a thiamine supplement. (R. 675).

On April 23, 2012, Plaintiff presented to Dr. Fanning's office for his annual evaluation. (R. 719). During this evaluation, it was documented that Plaintiff's cardiac symptoms were improving and that Plaintiff had not needed to take his nitroglycerin prescription. (R. 720). Therefore, Plaintiff's diagnosis of coronary atherosclerosis was labeled as "stable." (R. 721). However, his diagnosis of hyperlipidemia was labeled as "uncontrolled." (Id.). As a result, Plaintiff was prescribed Zetia in addition to his simvastatin prescription. (Id.). Plaintiff was also instructed to stop smoking. (Id.).

On May 10, 2012, Plaintiff returned to Dr. Ellis's office at the WVU Eye Institute for a follow-up appointment. (R. 935). During this visit, Plaintiff continued to complain of intermittent double vision, stating that "[i]f he covers one eye [the double vision] goes away." (Id.). Dr. Ellis ordered an "MRI scan of the orbits," which were normal. (R. 937-38, 942). After an examination, Dr. Ellis prescribed eye drops for Plaintiff. (R. 937).

On June 13, 2012, Plaintiff presented to the emergency room at the Ohio Valley Medical Center "at the urging of his family." (R. 1000). Plaintiff had informed his stepmother that "he was not going to [be] borrowing any money anymore," which she "took . . . to mean[ ] [that] he was going to kill himself." (Id.). Plaintiff denied suicidal ideation but stated that "if I can not [sic] take care of myself I am not supposed to be here." (Id.). Plaintiff was diagnosed with severe depression and referred to "Dr. Singer . . . [and] Shawn Tipton." (R. 1001).

On June 24, 2012, Plaintiff presented to Dr. Singer's office, where he stated that he had suicidal thoughts.[7] (R. 727). Therefore, on June 25, 2012, Plaintiff was admitted to Hillcrest Hospital's psychiatric unit under the care of Paul Papadimitriou, M.D. (Id.). After he was admitted, Plaintiff stated that he suffered from bipolar disorder, had attempted suicide at the age of seventeen years, and had undergone multiple psychiatric hospital admissions in his lifetime. (Id.). Plaintiff further stated that he had not taken any of his medications for the past two weeks. (Id.). Plaintiff was diagnosed with bipolar II disorder, alcohol dependence and polysubstance abuse and started on Wellbutrin and Depakote. (R. 728-29).

On June 28, 2012, Plaintiff was transferred from Hillcrest Hospital to the Ohio Valley Medical Center after complaining of chest pain. (R. 733). At the Ohio Valley Medical Center, Plaintiff was noted to be "a high risk for restenosis of his bare metal stent" due to his medication noncompliance. (R. 736). After an examination, Plaintiff was diagnosed with another acute, anterior myocardial infarction. (R. 737). Plaintiff

---

[7] After this appointment, Plaintiff routinely presented to Dr. Singer's office for individual therapy. (See, e.g., R. 833).

underwent another cardiac catheterization, during which another stent was placed in Plaintiff's heart. (Id.). The cardiac catheterization was deemed "[s]uccessful." (R. 765).

After the cardiac catheterization, Plaintiff was transferred back to Hillcrest Hospital's psychiatric unit to complete his psychiatric treatment. (R. 742-43). Plaintiff was re-started on Depakote. (R. 743). After Plaintiff was admitted, it was noted that:

> [Plaintiff's] presentation during this admission was different from his last admission. He was animated and had a good range to his affect. He apologized for being irritable and withdrawn during his last admission. There was no push of speech, but his speech was spontaneous. His thinking was goal directed. He denied psychotic symptoms. He denied suicidal or homicidal thoughts. He denied death wishes. Psychologic insight was fairly good. Memory function was good as well. He possessed decision-making capacity.

(R. 855). After completing his treatment, Plaintiff was discharged on July 6, 2012. (R. 853).

On August 24, 2012, Plaintiff presented to Dr. Fanning's office for post-hospitalization follow-up care. (R. 799). During this visit, Dr. Fanning documented that Plaintiff had stopped smoking in June. (R. 800-01). Dr. Fanning further documented that Plaintiff's hyperlipidemia was "improving" and that his diagnosis of coronary atherosclerosis was "stable." (R. 801).

On September 12, 2012, Plaintiff returned to Dr. Ellis's office at the WVU Eye Institute for a follow-up appointment regarding his double vision. (R. 946). After an examination, Plaintiff was referred to a neurologist for possible electromyography and/or a nutritional evaluation. (R. 947). Subsequently, when Plaintiff presented for his neurology consult, it was noted that Plaintiff's diagnosis of intermittent double vision was asymptomatic and that the neurological examination was "not concerning for [an] active neurologic process." (R. 953, 956).

On September 26, 2012, Plaintiff presented to the Pine Grove Health Clinic to establish as a new patient. (R. 990). During this visit, it was noted that Plaintiff had recently traveled to an emergency room due to hypoglycemia. (Id.). Therefore, after an examination, Plaintiff was diagnosed with hypoglycemia, as well as fatigue and a history of bipolar disorder and coronary artery disease. (Id.).

On October 9, 2012, Plaintiff presented to Wetzel County Hospital for pulmonary function testing. (R. 836-38). The results of these tests showed minimal obstructive airways disease. (R. 838).

On October 11, 2012, Plaintiff presented to Dr. Fanning's office for a follow-up appointment. (R. 843). Dr. Fanning ordered an echocardiogram of Plaintiff, which revealed:

> Left ventricular systolic function is normal. There is mild anterior wall hypokinesis. There is mild septal hypokinesis. Apical echoes consistent with trabeculae are noted. Cannot rule out associated thrombi.

(R. 844).

On April 16, 2013, Plaintiff returned to Dr. Ellis's office at the WVU Eye Institute for a follow-up appointment. (R. 964). During this appointment, Plaintiff stated that he had suffered from intermittent double vision "since grade school" but that he was not experiencing it "as often now." (R. 966). After an examination, Plaintiff was provided a new prescription for eyeglasses. (Id.).

In mid-2013, Plaintiff continued seeking care from the Pine Grove Health Clinic. On May 20, 2013, Plaintiff complained of, inter alia, feeling a "pop" in his shoulder. (R. 988). However, X-rays of his right shoulder were normal. (R. 934). On June 28, 2013, Plaintiff again complained of right shoulder pain and was prescribed a corticosteroid to

treat the pain. (R. 987). On July 23, 2013, Plaintiff complained of left neck and shoulder pain and was prescribed Naprosyn for the pain. (R. 986).

On January 24, 2014, Plaintiff presented to the emergency room at Wetzel County Hospital, complaining of acid reflux symptoms. (See R. 885, 887). During this visit, it was noted that Plaintiff needed an echocardiogram performed. (R. 887). Subsequently, Plaintiff presented to Dr. Fanning's office for his six-month cardiac evaluation. (R. 879). Plaintiff informed Dr. Fanning that, despite being prescribed the maximum dose of Protonix, he continued to experience acid reflux symptoms. (R. 880). Dr. Fanning ordered an echocardiogram of Plaintiff, which revealed a slightly elevated heart rate but no ischemia. (R. 882). Therefore, Plaintiff was instructed to undergo an esophagogastroduodenoscopy ("EGD"). (Id.).

On February 4, 2014, Plaintiff returned to Wetzel County Hospital's emergency room, complaining of continuing acid reflux symptoms. (R. 873, 930). Plaintiff was diagnosed with atrophic gastritis and admitted to the hospital. (R. 930). An EGD was performed, which revealed a moderate hiatal hernia. (R. 904). After the EGD, Plaintiff was started on a prescription of Carafate and discharged. (R. 895, 930).

On April 16, 2014, Plaintiff presented for another follow-up appointment at Dr. Ellis's office at the WVU Eye Institute. (R. 972). During this appointment, Plaintiff stated that he was experiencing double vision "infrequently." (Id.). After an examination, Plaintiff was diagnosed with, *inter alia*, a stable motility disorder. (R. 973).

### 3. Medical Reports/Opinions

#### a. Mental Impairment Questionnaire by Amanda Cummins, PA-C, November 1, 2011

On November 1, 2011, Amanda Cummins, PA-C, of Wheeling Health Right, submitted a Mental Impairment Questionnaire on behalf of Plaintiff. (R. 590-95). In this questionnaire, Ms. Cummins opined that Plaintiff suffers from depression. (R. 590). She listed Plaintiff's symptoms as: social withdrawal/isolation, inappropriate affect, decreased energy, appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability and a history of alcohol abuse. (Id.). When describing his treatment, Ms. Cummins stated that Plaintiff is prescribed Lexapro and opined that his prognosis is fair. (R. 591).

Ms. Cummins performed an analysis of Plaintiff's mental abilities in the questionnaire. (R. 592-93). Regarding the mental abilities and aptitude needed to do unskilled work, semiskilled work, and skilled work, Ms. Cummins opined that Plaintiff's abilities range from "fair" to "very good." (Id.). Regarding the mental abilities and aptitude needed to do particular types of jobs, Ms. Cummins opined that Plaintiff retains the abilities to do all types of jobs except those that involve using public transportation. (R. 593). When asked how often Plaintiff's impairments would cause him to be absent from work, Ms. Cummins opined "more than three times a month." (R. 592).

Finally, Ms. Cummins analyzed the degree of Plaintiff's functional limitations in the questionnaire. (R. 594). Specifically, Ms. Cummins rated Plaintiff's restriction of his activities of daily living as slight/moderate. (Id.). Ms. Cummins further rated Plaintiff's difficulties in maintaining social functioning as slight and Plaintiff's deficiencies of

concentration, persistence or pace as never/seldom. (Id.). Finally, Ms. Cummins rated

Plaintiff's episodes of decompensation as repeated. (Id.).

### b. Disability Determination Explanation by Philip E. Comer, Ph.D., February 15, 2012

On February 15, 2012, Philip E. Comer, Ph.D., a state agency physician,

prepared the Disability Determination Explanation at the Initial Level (the "Initial

Explanation"). (R. 59-66). In the Initial Explanation, Dr. Comer reported that Plaintiff had

failed to return forms pertinent to his claims for DIB and SSI benefits "despite [attorney]

involvement" and that "there [was] insufficient current evidence to assess [his] claim[s]."

(R. 64). Therefore, Dr. Comer was unable to perform a residual functional capacity

("RFC") assessment of Plaintiff. (See id.). However, based solely on Plaintiff's treatment

records, Dr. Comer opined that Plaintiff suffers from the following severe impairments:

(1) ischemic heart disease and (2) affective disorders. (Id.).

### c. Mental Status Examination by Jennifer Robinson, M.A., July 10, 2012

On July 10, 2012, Jennifer Robinson, M.A., a licensed psychologist, performed a

consultative Mental Status Examination of Plaintiff. (R. 780-83). Prior to this

examination, Ms. Robinson noted that Plaintiff's chief complaints include major

depressive disorder and bipolar disorder. (R. 780).

The Mental Status Examination consisted of a clinical interview and a mental

assessment of Plaintiff. (Id.). During the clinical interview, Plaintiff informed Ms.

Robinson that he has been recently diagnosed with bipolar disorder and placed on

mood stabilizers, which "seem[ ] to be working." (R. 781). Plaintiff further informed Ms.

Robinson that he has been hospitalized for psychiatric treatment six times in the past.

(Id.). Finally, Plaintiff informed Ms. Robinson that he still suffers from depressive episodes that "tend to last for several weeks." (Id.).

After interviewing Plaintiff, Ms. Robinson performed a thorough mental assessment of Plaintiff. (See R. 782-83). The assessment resulted in largely normal findings. (Id.). However, Ms. Robinson documented that Plaintiff's "[i]nsight into his problems [was] limited." (R. 782). After completing the Mental Status Examination, Ms. Robinson concluded that Plaintiff suffers from bipolar II disorder and that his prognosis is fair. (R. 782-83).

### d. Mental Impairment Questionnaire by David C. Singer, Ed.D., August 16, 2012

On August 16, 2012, Dr. Singer submitted a Mental Impairment Questionnaire on behalf of Plaintiff. (R. 785-89). In this questionnaire, Dr. Singer opined that Plaintiff suffers from, *inter alia*, bipolar II disorder, depression and anxiety. (R. 785). He listed Plaintiff's symptoms as: mood disturbance, emotional lability, anhedonia, suicidal ideation/attempts and irritability, to name a few. (Id.). When describing his treatment, Dr. Singer stated that Plaintiff is prescribed Depakote and opined that his prognosis is fair to moderate. (R. 786).

Dr. Singer performed an analysis of Plaintiff's mental abilities in the questionnaire. (R. 787-88). Regarding the mental abilities and aptitude needed to do unskilled work, semiskilled work, and skilled work, Dr. Singer opined that Plaintiff's abilities are mostly "fair" or "good." (Id.). Regarding the mental abilities and aptitude needed to do particular types of jobs, Dr. Singer opined that Plaintiff possesses "fair" or "good" abilities to do all types of jobs. (R. 788). When asked how often Plaintiff's

impairments would cause him to be absent from work, Dr. Singer opined "more than three times a month." (R. 787).

Finally, Dr. Singer analyzed the degree of Plaintiff's functional limitations in the questionnaire. (R. 789). Specifically, Dr. Singer rated Plaintiff's restriction of his activities of daily living as slight/moderate. (Id.). Dr. Singer further rated Plaintiff's difficulties in maintaining social functioning and in concentration, persistence or pace as moderate. (Id.). Finally, Dr. Singer rated Plaintiff's episodes of decompensation as repeated. (Id.).

### e. Mental Impairment Questionnaire by Paul Papadimitriou, M.D., August 22, 2012

On August 22, 2012, Dr. Papadimitriou submitted a Mental Impairment Questionnaire on behalf of Plaintiff. (R. 792-96). In this questionnaire, Dr. Papadimitriou opined that Plaintiff suffers from bipolar II disorder. (See R. 792). He listed Plaintiff's symptoms as, *inter alia*, poor memory, difficulty thinking/concentrating, psychomotor agitation/retardation and emotional lability. (Id.). When describing his treatment, Dr. Papadimitriou stated that Plaintiff is prescribed Lamictal, Depakote and Wellbutrin and opined that his prognosis is guarded. (R. 793).

Dr. Papadimitriou performed an analysis of Plaintiff's mental abilities in the questionnaire. (R. 794-95). Regarding the mental abilities and aptitude needed to do unskilled work, semiskilled work, and skilled work, Dr. Papadimitriou opined that Plaintiff's abilities are mostly "fair" or "poor." (Id.). Regarding the mental abilities and aptitude needed to do particular types of jobs, Dr. Papadimitriou opined that Plaintiff possesses "fair" abilities to do all types of jobs. (R. 795). When asked how often

Plaintiff's impairments would cause him to be absent from work, Dr. Papadimitriou opined "more than three times a month." (R. 794).

Finally, Dr. Papadimitriou analyzed the degree of Plaintiff's functional limitations in the questionnaire. (R. 796). Specifically, Dr. Papadimitriou rated Plaintiff's restriction of his activities of daily living as moderate. (Id.). Dr. Papadimitriou further rated Plaintiff's difficulties in maintaining social functioning as moderate and his deficiencies of concentration, persistence or pace as frequent. (Id.). Finally, Dr. Papadimitriou rated Plaintiff's episodes of decompensation as repeated. (Id.).

### f. Disability Determination Examination by Thomas J. Schmitt, M.D., October 20, 2012

On October 20, 2012, Thomas J. Schmitt, M.D., a state agency physician, performed a Disability Determination Examination of Plaintiff. (R. 847-52). This examination consisted of, *inter alia*, pulmonary status and orthopedic status evaluations. (R. 847).

Dr. Schmitt's examination revealed many normal findings. (See id.). However, the examination also revealed several abnormal findings. (See id.). When summarizing those findings, Dr. Schmitt stated:

> Pulmonary Status: [Plaintiff] has a history of smoking of 20 years duration. He is moderately dyspneic on walking a slight grade or a flight of stairs or a distance greater than one block. He does have a history of exposure to pulmonary irritants intermittently while working in textile mills. He does not use bronchodilators. He has no history of childhood asthma and no known diagnosis of COPD or emphysema. . . .

> Orthopedic Status: There has been no history of injury. There is no appreciable muscle atrophy. The deep tendon reflexes are normal and symmetrical. There are no sensory deficits and [Plaintiff] is able to perform heel and toe walking without difficulty. Peripheral pulses are present and palpable without vascular abnormalities. The range of motion is free and full in all joints.

(R. 849-50). Ultimately, Dr. Schmitt concluded that Plaintiff suffers from decreased exertional capacity, multiple arthralgias and chronic low back syndrome. (Id.).

### g. Disability Determination Explanation by Fulvio Franyutti, M.D., November 19, 2012

On November 19, 2012, Fulvio Franyutti, M.D., a state agency medical consultant, performed the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 68-85). In the Reconsideration Explanation, Dr. Franyutti agreed with Dr. Comer's conclusion that Plaintiff suffers from severe ischemic heart disease and affective disorders. (R. 79).

Dr. Franyutti completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 81). During this assessment, Dr. Franyutti found that, while Plaintiff possesses no manipulative, visual, communicative or environmental limitations, Plaintiff possesses exertional and postural limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Franyutti found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (Id.). Regarding Plaintiff's postural limitations, Dr. McCullough found that Plaintiff is limited to only occasionally climbing ramps/stairs, climbing ladders/ropes/scaffolds, balancing, stooping, kneeling, crouching and crawling. (Id.). After completing the RFC assessment, Dr. Franyutti determined that Plaintiff is able to perform light-exertional work. (R. 84).

Also in the Reconsideration Explanation, Frank Roman, Ed.D., completed a Psychiatric Review Technique ("PRT") form and a Mental RFC Assessment of Plaintiff.

(R. 79, 82-83). On the PRT form, Dr. Roman analyzed the degree of Plaintiff's functional limitations. (R. 79). Specifically, Dr. Roman rated Plaintiff's restriction of his activities of daily living as "[m]ild." (Id.). Dr. Roman further rated Plaintiff's difficulties in maintaining social functioning and in maintaining concentration, persistence and pace as "[m]oderate." (Id.). Finally, Dr. Roman rated Plaintiff's episodes of decompensation as "[o]ne or [t]wo." (Id.).

In the Mental RFC Assessment of Plaintiff, Dr. Roman determined that Plaintiff does not possess any understanding/memory limitations or adaptation limitations. (R. 82-83). However, Dr. Roman further determined that Plaintiff sustained concentration and persistence limitations and social interaction limitations. (Id.). Regarding Plaintiff's limitations in sustained concentration and persistence, Dr. Roman found that Plaintiff is not significantly limited in his abilities to: (1) carry out very short and simple instructions; (2) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them and (5) make simple work-related decisions. (Id.). However, Dr. Roman further found that Plaintiff is moderately limited in his abilities to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Id.). When explaining these findings, Dr. Roman noted that they were based on Plaintiff's history of treatment non-compliance but that, "[w]ith continued compliance

to treatment and abstinence from alcohol, [Plaintiff] is able to follow routine entry level work" and is capable of performing substantial gainful activity. (R. 83).

Regarding Plaintiff's limitations in social interaction, Dr. Roman found that Plaintiff is not significantly limited in his abilities to: (1) interact appropriately with the general public; (2) ask simple questions or request assistance; (3) get along with coworkers or peers without distracting them or exhibiting behavioral extremes and (4) ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Id.). However, Dr. Roman also found that Plaintiff is moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. (Id.). When explaining these findings, Dr. Roman noted that Plaintiff is sociable when he is compliant with his treatment but "[w]hen noncompliant he withdraw[s] into himself and neglects work and hygiene." (Id.).

## C.    Testimonial Evidence

During the administrative hearing on May 21, 2014, Plaintiff divulged his personal facts and work history. At one point in time, Plaintiff had been approved for disability benefits. (R. 41). However, he returned to work voluntarily, believing that he could perform his job duties if he stayed on his medication. (Id.). Plaintiff worked "for a couple of years," until "the work dried up" and his employer "didn't have a need for [him] anymore." (R. 41-42). After Plaintiff stopped working, he "started drinking again" and stopped taking his medications. (R. 42). He went into "alcohol detox" in 2010 and has not had a drink since January of 2012. (Id.).

While he did not name any specific conditions, Plaintiff testified that he suffers from physical impairments. (R. 38-39, 41). He is "not able to move as well as [he] used

to" and becomes "winded easily." (R. 38). He finds lifting objects difficult. (R. 41).

Occasionally, he experiences problems with fatigue and weakness. (R. 39). He also

occasionally experiences double vision and states that his vision generally "is not . . .

near as good as it used to be." (R. 41). Because of his vision problems, Plaintiff wears

glasses when operating a motor vehicle. (Id.).

In addition to his physical impairments, Plaintiff testified that he suffers from

bipolar disorder. (R. 38). Plaintiff's bipolar disorder causes manic and depressive

episodes. (See id.). While Plaintiff no longer experiences manic episodes due to his

medication regimen, he still experiences depressive episodes. (Id.). The depressive

episodes can last ten to fourteen days. (Id.). During the episodes, Plaintiff mostly

sleeps, lacks an appetite avoids social situations by staying at home and has thoughts

of suicide. (R. 38-40). While Plaintiff has seen a counselor in the past, he is not seeing

one currently, although he is receiving mental health treatment. (R. 39). He is

prescribed Wellbutrin, Lamictal and Depakote for his bipolar disorder, which "help,"

particularly with the manic episodes, but result in weight gain. (R. 40). Plaintiff states

that, due to his mental condition, he experiences "racing thoughts" and difficulty

concentrating and frequently starts tasks/projects that he is unable to finish. (R. 41).

**D.     Vocational Evidence**

**1.  Vocational Testimony**

Linda Dezack, an impartial vocational expert, also testified during the

administrative hearing. (R. 42-47). Initially, Ms. Dezack testified regarding the

characteristics of Plaintiff's past relevant work. (R. 45). Specifically, Ms. Dezack testified

that Plaintiff has worked as a billing clerk, electrician and computer programmer. (Id.).

Ms. Dezack characterized these jobs as light and semi-skilled, medium and mid-skilled and medium and mid-skilled, respectively. (Id.).

After Ms. Dezack described Plaintiff's past relevant work, the ALJ presented a hypothetical question for Ms. Dezack's consideration. In the hypothetical, the ALJ asked Ms. Dezack to:

> [A]ssume a hypothetical individual of [Plaintiff's] age, educational background and work history, who would be able to perform a range of light work, could perform postural movements . . . occasionally, except could not climb ladders, ropes or scaffolds. To the maximum extent possible, should walk on level or even surfaces. Other surfaces are not precluded [inaudible]. Should have no concentrated exposure to temperature extremes, wet or humid conditions or respiratory irritants. And should have no exposure to hazards. Should work in a low-stress environment with no production line or assembly-line-type pace. No independent decision making possibilities, and minimal changes in the daily work routine. Would be limited to unskilled work[,] . . . involving only routine, repetitive instructions and tasks. Should have no interaction with the general public and minimal, no more than occasional[ ] interaction with coworkers and supervisors.

(R. 45-46). The ALJ then asked Ms. Dezack if the hypothetical individual would be employable. (R. 46). Ms. Dezack responded in the affirmative, stating that such an individual could work as a laundry worker, electronics worker or collator operator. (Id.). After the ALJ's hypothetical question, Ms. Dezack declared that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Id.).

Plaintiff's counsel, Ms. Atkins, also presented questions for Ms. Dezack's consideration during the administrative hearing. (R. 47). First, Ms. Atkins asked whether the hypothetical individual would be employable if he or she "were to be absent three times or more a month, either missing a full day of work or a half-a-day of work three times or more a month." (Id.). Ms. Dezack responded that such an individual would not be employable. (Id.). Second, Ms. Atkins asked whether

the laundry worker, electronics worker and collator operator positions that she previously named would be available if a hypothetical individual "were unable to maintain attention for two-hour segments; meaning, they would be able to maintain concentration, persistence and pace for less than two hours at a time." (Id.). Ms. Dezack responded that the three named positions would not be available. (Id.). Finally, Ms. Atkins asked whether an individual would be employable if he or she "were off task more than 20 percent of the workday," to which Ms. Dezack responded in the negative. (Id.).

### 2. Disability Reports and Work Activity Reports

On November 2, 2011, Plaintiff submitted his first Work Activity Report. (R. 171-76). In this report, Plaintiff stated that he has worked since his alleged onset date. (R. 171). Specifically, Plaintiff stated that from June 29, 2011, to September 5, 2011, he worked in the billing office at Northwood Health Systems for thirty hours a week. (R. 172). Finally, Plaintiff stated that he stopped working for Northwood Health Systems because of his medical condition. (Id.).

On November 8, 2011, Plaintiff completed a Disability Report. (R. 185-93). In this report, Plaintiff indicated that the following ailments limit his ability to work: (1) depression; (2) high blood pressure; (3) a history of a heart attack; (4) back impairments; (5) neck impairments and (6) knee impairments. (R. 186). He further indicated that he stopped working on February 17, 2011, "[b]ecause of [his] conditions." (Id.). Finally, he indicated that he takes the following medications for his impairments: Altace, aspirin, carvedilol, Effexor, Flexeril, nitroglycerin, Plavix, Protonix, Risperdal and simvastatin. (R. 189).

Two Disability Report-Appeal forms were submitted on Plaintiff's behalf. (R. 197-02, 219-22). On April 12, 2012, Stefie Smith, an employee of Jan Dils, Attorneys at Law, LC, reported that Plaintiff's depression was worsening and that he "[w]on't get out of bed for 4-5 days at a time." (R. 197). Ms. Smith further reported that Plaintiff had been experiencing double vision and was receiving "ongoing testing for this." (Id.). Finally, Ms. Smith updated Plaintiff's list of medications to include Lexapro and Wellbutrin. (R. 200). On January 17, 2013, Plaintiff disclosed that he suffers from, *inter alia*, coronary artery disease and bipolar disorder, in addition to his previously identified impairments. (R. 222). Plaintiff also disclosed that his medications had changed.[8] (Id.).

On May 16, 2014, Plaintiff submitted a second Work Activity Report, which was sparsely completed. (R. 226-32). In this report, Plaintiff reports that, while he is not working, he receives royalties from EQT Production Company, a petroleum and natural gas exploration and pipeline business, and money from his parents every month. (R. 226).

## E.  Lifestyle Evidence

### 1.  Adult Function Report, May 8, 2012

On May 8, 2012, Plaintiff completed an Adult Function Report. (R. 204-11). In this report, Plaintiff states that he is unable to work because:

> My depression sometimes prevents me from doing anything but sleeping and using the bathroom for periods of 3-14 days. My neck[,] shoulders [and] back are always in some degree of pain, as are my feet. I had a

---

[8] On April 8, 2014, Plaintiff submitted a form entitled "Claimant's Medications," in which he again updated his list of medications. (R. 224-25). Specifically, Plaintiff stated that he takes the following medications: (1) Altace, simvastatin, carvedilol and aspirin for his heart; (2) Zetia for high cholesterol; (3) Protonix, Sucralfate and "Daily-Acid Reflux" for GERD; (4) Divalproex, Lamotrigine and Wellbutrin for bipolar disorder; (5) cyclobenzaprine as a muscle relaxant; (6) naproxen for pain; (7) trazodone as a sleep aid and (8) nitroglycerin for chest pains. (Id.). Plaintiff also stated that he takes various vitamins. (R. 225).

heart attack on 9/9/11, and have been having intermittent double vision
since November 2011.

(R. 204).

Plaintiff discloses that he is limited in some ways but not in others. In several
activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to
perform his own personal care, although he struggles with motivation and can go "3-10
days" without bathing." (R. 205). He is able to prepare his own meals and care for his
pet cat. (R. 205-06). He is able to operate a motor vehicle and leave the house without
accompaniment. (R. 207). He is able to shop in stores for groceries and pay bills, count
change, handle a savings account and use a checkbook/money orders. (Id.). He is able
to socialize with others when "they come to [his] house." (R. 208). He is also able to get
along with authority figures and follow written and spoken instructions. (R. 208-10).

While Plaintiff is able to perform some activities, he describes how others prove
more difficult due to his physical and mental impairments. Plaintiff's impairments affect
his abilities to: lift, squat, bend, stand, reach, walk, kneel, hear, climb stairs, see,
memorize information, complete tasks, concentrate, follow instructions and get along
with others. (R. 209). Plaintiff explains that he is able to walk one to two blocks before
requiring a five- to ten-minute rest and pay attention for five to ten minutes. (Id.). He
further explains that does not handle stress or changes to his routine well (R. 210).
Finally, Plaintiff explains that his depression causes him to him to think of suicide and
affects his motivation, appetite and sleep patterns. (R. 205-06, 210).

## 2. Personal Pain Questionnaire, May 8, 2012

On May 8, 2012, Plaintiff submitted a Personal Pain Questionnaire.[9] (R. 212-16). In this questionnaire, Plaintiff indicates that he suffers from pain in his neck, shoulders and feet. (R. 212-14). Regarding his neck pain, Plaintiff characterizes his pain as aching, cramping and continuous in nature. (R. 212). He rates the pain as a four on a scale of one through ten. (Id.). He declares that "any type of housework" aggravates his pain and that stretching and laying down relieves it. (Id.). He states that he takes Flexeril for the pain, which he describes as "[s]ometimes effective. (R. 213).

Regarding his shoulder pain, Plaintiff characterizes the pain as aching, stabbing, throbbing and continuous in nature. (Id.). Similar to his neck pain, he declares that "housework" aggravates his pain and that laying down relieves it. (R. 214). He states that he takes Flexeril for his shoulder pain, as well as his neck pain, and that it is "[s]ometimes" effective. (Id.).

Regarding his foot pain, Plaintiff characterizes the pain as stabbing and stinging in nature. (Id.). He rates the pain as a three on a scale of one through ten. (R. 215). He estimates that the pain lasts "[a] few hours at a time" throughout a day. (Id.). He declares that "medications" aggravate his pain and that "certain types of shoes" relieve it. (Id.). He states that he does not take any medication for the pain. (Id.).

## IV.     THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his

---

[9] Plaintiff received assistance from his attorney's office when completing this form. (R. 216).

previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses

the following five-step sequential evaluation process to determine whether a claimant is

disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the

claimant to prove that he or she is disabled and that, as a result of the disability, he or

she is unable to engage in any gainful employment. <u>Richardson v. Califano</u>, 574 F.2d

802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the

Commissioner at step five to demonstrate that jobs exist in the national economy that

the claimant is capable of performing. <u>Hicks v. Gardner</u>, 393 F.2d 299, 301 (4th Cir.

1968). If the claimant is determined to be disabled or not disabled during any of the five

steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V. <u>ADMINISTRATIVE LAW JUDGE'S DECISION</u>

Utilizing the Social Security Administration's five-step sequential evaluation

process, the ALJ found that:

1. The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits throughout the "period at issue" herein, i.e., since the February 17, 2011, date of alleged disability onset.

2. The claimant has not engaged in apparent "substantial gainful activity" at any time during the period at issue (20 CFR §§ 404.1520(b) and 404.1571 *et seq.*).

3. During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: history of coronary artery/atherosclerotic heart disease with intermittent angina/decreased exertional capacity, status post myocardial infarction, percutaneous transluminal coronary angioplasty (PTCA) and stent placement (x2); major depressive/bipolar II disorder(s); and history of polysubstance (including alcohol, cannabis, cocaine and opiates) abuse/dependence, indicated to be in partial remission since July 2012 (20 CFR § 404.1520(c)).

4. During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in

Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525 and 404.1526).

5.      Throughout the period at issue, the claimant has had at least the [RFC] to perform a range of work activity that: requires no more than a [ ]light level of physical exertion; requires no climbing of ladders, ropes or scaffolds, and no more than occasional performance of other postural movements (i.e., balancing, climbing ramps/stairs, crawling, crouching, kneeling or stooping); affords even and level surfaces for essentially all required ambulation, without strict preclusion of other surfaces; entails no concentrated exposure to temperature extremes, wetness, humidity or respiratory irritants, and no exposure to hazards; entails a low level of stress such as would involve no assembly/production line type of pace, no independent decision making responsibilities and no more than minimal changes in daily routine; involves only unskilled, routine and repetitive instructions and tasks; and requires no contact with the public and no more than occasional interaction with coworkers/supervisors (20 CFR §§ 404.1520(e) and 404.1567(b)).

6.      Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of any "vocationally relevant" past work (20 CFR § 404.1565).

7.      The claimant is considered for decisional purposes as a "younger individual" (20 CFR § 404.1563).

8.      The claimant has attained more than a "high school" education and is able to communicate in English (20 CFR § 404.1564).

9.      The case presents no material issues with regard to the potential transferability of any previously acquired job skills (see Social Security Ruling 82-41, 20 CFR §§ 404.1568 and Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, level of education, work experience, and impairment-related limitations throughout the period at issue, he has remained capable of performing jobs that exist in significant numbers within the national economy (20 CFR §§ 404.1560(c) and 404.1566).

11.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time during the period at issue herein, i.e., since February 17, 2011 (20 CFR §§ 404.1520(g)).

(R. 17-24).

## VI.   DISCUSSION

### A.   Contentions of the Parties

In his Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is contrary to the law and is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ failed to properly evaluate the opinions of Drs. Singer, Papadimitriou and Roman. (Pl.'s Mem. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 6-11, ECF No. 11). Plaintiff requests that the Court remand the case for further proceedings. (Id. at 11).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ properly evaluated the medical opinions of record. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 10, ECF No. 15). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

### B.   Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind

might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis of the Administrative Law Judge's Decision**

### 1.  Whether the ALJ Properly Evaluated Drs. Singer and Papadimitriou's Opinions

Plaintiff challenges the ALJ's evaluation of the medical opinions of Drs. Singer and Papdimitriou. (Pl.'s Br. at 6-11). An ALJ must "weigh and evaluate every medical opinion in the record." Monroe v. Comm'r of Soc. Sec., No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). When weighing and evaluating these opinions, an ALJ often accords "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the claimant and has a treatment relationship with the claimant. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). However, this "treating physician rule . . . does not require that the [treating physician's] testimony be given controlling weight." Anderson v. Comm'r, Soc. Sec., 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence," then it should

not be accorded controlling weight. Id. Additionally, if a physician's opinion encroaches on an issue reserved to the Commissioner, including the issue of whether a claimant meets the statutory definition of disability, then the opinion should not be accorded controlling weight. 20 C.F.R. § 404.1527(d)(3).

When evaluating medical opinions that are not entitled to controlling weight, an ALJ must consider the factors detailed in 20 C.F.R. § 404.1527. Id. at § 404.1527(c) These factors include: (1) whether the physician has examined the claimant; (2) the treatment relationship between the physician and the claimant, including the nature and extent of the treatment relationship; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist and (6) any other factor that tends to support or contradict the opinion. Id. An ALJ, however, need not explicitly "recount the details of th[e] analysis [of these factors] in the written opinion." Fluharty v. Colvin, No. CV 2:14-25655, 2015 WL 5476145, at *12 (S.D. W. Va. Sept. 17, 2015).

While an ALJ need not explicitly recount his or her analysis of the factors listed in 20 C.F.R. § 404.1527, an ALJ must "give 'good reasons' in the [written] decision for the weight ultimately allocated to medical source opinions." Id. (quoting 20 C.F.R. § 404.1527). In this regard, Social Security Ruling 96–2p provides that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Once an ALJ has determined "the weight to be assigned to a medical opinion[,] [that determination] generally will not be disturbed absent some indication that the ALJ has dredged up

'specious inconsistencies' or has failed to give a sufficient reason for the weight afforded a particular opinion." Dunn v. Colvin, 607 F. App'x. 264, 267 (4th Cir. 2015) (internal citations omitted).

Plaintiff argues that the ALJ failed to recognize Drs. Singer and Papadimitriou as treating sources and, therefore, failed to accord their opinions the special deference to which they were entitled. (Pl.'s Br. at 8). The ALJ stated that he was "entirely disinclined to credit" the limitations and severe symptoms set forth in the Mental Impairment Questionnaires submitted by Drs. Singer and Papadimitriou on August 16, 2012, and August 22, 2012, respectively. (R. 23). The ALJ reasoned that these opinions should not be credited because:

> [Both physicians] are found to have significantly or at least somewhat overstated the severity and likely duration of [Plaintiff's] symptoms and related functional limitations. Further, they were all offered during a period that [Plaintiff] was continuing to abuse or had otherwise only very recently stopped (per his assertions) abusing substances. Therefore, the [undersigned ALJ] is entirely disinclined to credit any perceived limitations and symptoms as intractable over any relevant period of 12 consecutive months. Evidence discussed above indicates [Plaintiff is able] to live independently, to drive, to shop, to walk for exercise, and to do some computer and janitorial work. . . . Evidence indicates that, to the extent that he were to be compliant with recommended treatment and to abstain from substance abuse, he has remained possessed of the inherent functional capacity to perform at least such a limited range of work activity as has been defined within the parameters above.

(Id.).

The undersigned finds that Plaintiff's argument lacks merit. Initially, the undersigned notes that there is no evidence that the ALJ failed to consider the fact that Drs. Singer and Papadimitriou are two of Plaintiff's treating physicians. In fact, the ALJ explicitly discussed Dr. Papadimitriou's treatment of Plaintiff at the Hillcrest Psychiatric Unit during June and July of 2012 in his written opinion. (R. 19-20); see also Pearson v.

Colvin, No. 2:14-CV-26, 2015 WL 3757122, at *34 (N.D. W. Va. June 16, 2015) (stating that a reviewing court must read an ALJ's "decision as a whole" when evaluating it).

Moreover, the ALJ followed the requirements of 20 C.F.R. § 404.1527 and SSR 96-2p when evaluating the opinions. It is clear that the ALJ determined that the opinions of Drs. Singer and Papadimitriou are inconsistent with substantial evidence, rendering them unsuitable of controlling weight. (See id.). It is also clear that, after determining that the opinions are not entitled to controlling weight, the ALJ considered the factors detailed in 20 C.F.R. § 404.1527 when deciding how much weight to accord the opinions. Contrary to Plaintiff's contention, the ALJ was not required to recount his analysis of these factors in his written opinion or explicitly state that Drs. Singer and Papadimitriou had treated Plaintiff at a point in time. Instead, the ALJ was only required to supply good reasons for his decision to not credit the opinions, which he did.

While Plaintiff argues that, when supplying his reasons for discrediting the opinions, "the ALJ declined to cite to any evidence that . . . contradicted the . . . opinions . . . or supported the ALJ's finding," the undersigned disagrees. (Pl.'s Br. at 9). The ALJ made clear the inconsistencies between Drs. Singer and Papadimitriou's opinions and the evidence of record and supported his findings in his summarization of the evidence that he discussed prior to his decision to discredit the opinions. See Parsons v. Astrue, No. CIV.A. 5:07-CV-00784, 2009 WL 688216, at *15 (S.D. W. Va. Mar. 13, 2009) (stating that, although the ALJ did not explicitly identify which treatment records were inconsistent with the treating physician's opinion when according the opinion no weight, "the inconsistencies [were] clear from the ALJ's prior summary of the evidence").

For example, when the ALJ reasoned that the opinions were not consistent with

evidence that Plaintiff is able to live independently, drive, shop, walk for exercise and do some computer and janitorial work, the ALJ was referring to specific evidence that he had discussed in a previous paragraph. (R. 22) ("In April 2012 he reported living alone (independently) and walking occasionally for exercise (Exhibit C18F/3). . . . In July 2012 he told Psychologist Robinson that he lived alone, did cooking, cleaning and laundry . . . [and] admitted that he drove and went shopping . . . (Exhibit C21F/4). . . .). Likewise, when the ALJ further reasoned that Plaintiff's functional capacities improve when he abstains from substance abuse and is compliant with his treatment, he was referring to his previous statement that Plaintiff's Global Assessment of Functioning ("GAF") scores "rang[ed] from 53 to 60 [out of 100] . . . with rapid improvement of lower scores associated with treatment, medication compliance and reported abstinence from substance abuse (Exhibits C19F/2, 17, C22F/1 and C23F/1)." (R. 22-23). Therefore, the ALJ supported his reasoning with specific evidence.

Because the ALJ followed the requirements of 20 C.F.R. § 404.1527 and SSR 96-2p when evaluating the opinions Drs. Singer and Papadimitriou, the undersigned finds that any error committed by the ALJ was harmless in nature. A "court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." Emigh v. Comm'r of Soc. Sec., No. 3:14-CV-36, 2015 WL 545833, at *21 (N.D. W. Va. Feb. 10, 2015). In the instant case, it is clear the ALJ would have reached the same result notwithstanding any error. Accordingly, Plaintiff has not shown that any error on the part of the ALJ was anything but harmless and the undersigned finds that the ALJ's decision to discredit Drs. Singer and Papadimitriou's opinions is

supported by substantial evidence. <u>Bradley v. Colvin</u>, No. 2:14-CV-23774, 2015 WL 5725832, at *5 (S.D. W. Va. Sept. 30, 2015) (stating that the burden of establishing that an ALJ's error is more than harmless is on the plaintiff).

### 2. Whether the ALJ Properly Evaluated Dr. Roman's Opinion

Plaintiff argues that, despite according Dr. Roman's opinion in the Reconsideration Explanation "great weight," the ALJ failed to credit or explain why he was rejecting Dr. Roman's statement that Plaintiff is moderately limited in his "ability to complete a normal workday and workweek . . . and to perform at a consistent pace without an unreasonable number and length of rest periods." (Pl.'s Br. at 11). The undersigned finds that this argument lacks merit. While Dr. Roman did state that Plaintiff is moderately limited in his ability to complete a normal workday/workweek and perform at a consistent pace, Dr. Roman explained that this limitation stemmed from Plaintiff's noncompliance with treatment. (R. 83). In fact, Dr. Roman further explained in his opinion that:

> With continued compliance to treatment and abstinence from alcohol, [Plaintiff] is able to follow routine entry level work in a low pressure setting with minimal production goals . . . [and] retains the capacity for . . . [substantial gainful activity]."

(<u>Id</u>.). Therefore, when taken in its entirety, Dr. Roman's opinion is congruous[10] with the ALJ's decision and the ALJ was not required to explicitly address Dr. Roman's statement that Plaintiff is moderately limited in his ability to complete a normal workday/workweek.

Plaintiff argues that, because the ALJ accorded Dr. Roman's opinion great

---

[10] The undersigned notes that the ALJ thoroughly discussed Plaintiff's non-compliance and substance abuse issues in his written opinion and explicitly stated that Plaintiff's functional limitations improve when he is compliant with his treatment and when he abstains from abusing substances. (R. 22-23).

weight, he was required to include every limitation identified by Dr. Roman in the RFC determination. (Pl.'s Reply at 3-4). However, Dr. Roman referred to two sets of limitations in his opinion: (1) the limitations that Plaintiff possesses when he is noncompliant with his treatment and (2) the limitations, or lack thereof, that he possesses when he is compliant with his treatment. The ALJ made clear that he credited both of these opinions. However, because an RFC represents the *most* an individual can do despite his or her limitations or restrictions, not the *least*, the ALJ properly declined to include the former set of limitations in the RFC determination. SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). Consequently, the undersigned finds that the ALJ's decision to accord Dr. Roman's opinion great weight is supported by substantial evidence.

## VII.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in

waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841, 845-48 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 15th day of December, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE